UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ERIC PEREZ, an individual, **Plaintiff**, v. THE RIDE EXPERIENCE, LLC, d/b/a THE ADVANTAGED, a Florida limited liability company, NANCY ELVIRA MALDONADO-YANEZ, an individual, and JOSE A. MALDONADO, an individual, **Defendants**. | CASE NO.: |

## COMPLAINT

Plaintiff Eric Perez, through undersigned counsel, files this Complaint against The Ride Experience, LLC d/b/a The Advantaged, Nancy Elvira Maldonado-Yanez, and Jose Antonio Maldonado, and in support states:[1]

## INTRODUCTION

1. This case arises from Defendants' unfair competition and illegal conduct in the yacht brokerage industry. Advantaged, at the behest of its principals, Mr. Maldonado and Ms. Maldonado-Yanez, misclassified its former employee, Mr. Perez, as an independent contractor for years. During that time, Defendants refused to pay Mr. Perez what he was rightly owed. Now, Defendants are trying to maintain their unfair grip on the yacht brokerage industry by claiming that Mr. Perez is precluded from competing with them based on illegal and unenforceable restrictive covenants.

---

[1] Plaintiff Eric Perez is "Mr. Perez" or "Plaintiff." Defendant The Ride Experience, LLC, d/b/a The Advantaged is "Advantaged." Defendant Nancy Elvira Maldonado-Yanez is "Yanez." Defendant Jose Antonio Maldonado is "Maldonado." Advantaged, Yanez, and Maldonado collectively are "Defendants."

1

2. Defendants hired Mr. Perez in 2015. Throughout his entire employment with Advantaged, Defendants fraudulently misrepresented to Mr. Perez that he was an independent contractor and misclassified him as same.

3. The reason for Defendants' conduct is obvious: It saved them money and gave them an unfair advantage over law-abiding competitors. Defendants routinely required Mr. Perez to work 50-hour weeks and gave him an ever-expanding list of responsibilities. While other firms might expect to pay overtime wages and employment taxes for that kind of help—Defendants got it for $600 a week.

4. Advantaged unceremoniously laid Mr. Perez off when the COVID-19 pandemic began. With a family to support, Mr. Perez continued brokering yachts to make a living. Two months later, Maldonado attempted to rehire Mr. Perez—at half his former salary. Mr. Perez declined the offer. Defendants then launched an aggressive campaign of falsehoods, threats of litigation, and outright intimidation to prevent yacht owners from doing business with Mr. Perez.

5. Defendants' threats were predicated on restrictive covenants contained in Mr. Perez's employment agreement. The realities of the yacht brokerage industry belie the existence of any legitimate business interest that support the enforceability of those restrictive covenants. As such, the restrictive covenants—and actions to enforce them—are simply illegal attempts to stifle fair, ordinary, and lawful competition.

6. This is an action for a declaratory judgment holding the at-issue restrictive covenants illegal, breach of contract, tortious interference, violation of the Fair Labor Standards Act for failure to pay overtime wages, deceptive and unfair trade practices, and fraud.

## PARTIES

7. Plaintiff is a Florida citizen residing in Miami-Dade County, Florida. He is a licensed yacht and ship broker in the State of Florida. At all times material, Mr. Perez was Defendants' employee within the meaning of 29 U.S.C. § 203(3).

8. Defendant Yanez is a citizen and resident of Miami-Dade County, Florida.

9. Defendant Maldonado is a citizen and resident of Miami-Dade County, Florida.

10. Defendant Advantaged is a limited liability company organized and existing under the laws of the State of Florida that maintains its principal place of business at 1900 S. Miami Ave., Miami, Florida 33129. Advantaged is an employer within the meaning of 29 U.S.C. § 203(d).

11. At all times material, Advantaged was an "enterprise engaged in commerce" within the meaning of 29 U.S.C. § 203. Mr. Perez's work for Defendants affected interstate commerce for the relevant time period because the materials that he used on a constant and continual basis, and that were supplied to him by Defendants to use on the job, moved through interstate commerce prior to and/or subsequent to Mr. Perez's use of the same. Additionally, upon information and belief, Advantaged grossed in excess of $500,000 per annum for the relevant time period.

12. Yanez and Maldonado are the owner and operators of Advantaged. As Advantaged's owners, Yanez and Maldonado had, at all times material, operational control over significant aspects of Advantaged's day-to-day functions, including the compensation, scheduling, and supervision of employees. Defendants Yanez and Maldonado are employers within the meaning of 29 U.S.C. § 203(d). Defendants Yanez and Maldonado are personally liable for the FLSA violations complained of herein.

13. At all times material, Defendants maintained control, oversight, and direction over Mr. Perez in his capacity as an employee of Advantaged, including, but not limited to, hiring and firing decisions, determining the rate of pay and work schedules, maintaining employment records, and otherwise controlling the terms and conditions of Mr. Perez's employment.

14. At all times material, Defendants had control over and the power to change compensation practices that harmed Mr. Perez and other individuals they employed.

## JURISDICTION AND VENUE

15. This Court has federal-question jurisdiction, pursuant to 28 U.S.C. § 1331, over the Plaintiff's claims arising under the Federal Labor Standards Act ("FLSA").

16. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the Plaintiff's state law claims because they are so closely related to Plaintiff's claims under the FLSA that they form part of the same case or controversy under Article III of the United States Constitution.

17. This Court has personal jurisdiction over Advantaged because it is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida, and continuously conducts business in Miami-Dade County, Florida.

18. This Court has personal jurisdiction over Yanez and Maldonado because each is a Florida citizen residing in Miami-Dade County, Florida.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Advantaged is subject to personal jurisdiction in this District and because the acts giving rise to the claims herein occurred in this District.

## GENERAL ALLEGATIONS

### A. Yacht Chartering and Sales in Miami Beach, Florida

20.     Defendant Advantaged competes in the yacht brokerage industry. Yacht brokers assist in two transactions: (a) the sale and purchase of yachts and other vessels; and (b) the reservation ("chartering") of yachts by individuals or groups. Brokering a yacht charter involves securing yachts to be chartered and individuals to charter them.

21.     In this industry, exclusivity is nearly non-existent. Yacht owners earn more income by diversifying their charter brokers, which results in a higher number of charters per yacht. On the sale and purchase side, once the transaction is complete, the customer relationship ends.

22.     In recent years—and particularly during the ongoing pandemic—the number of players in this industry has greatly expanded. On the one hand, more yacht owners have become willing to insulate their investment by chartering their vessels. On the other, any person with a cell phone can charter a yacht. Club promoters, agents, and other businessmen have all entered the world of yacht chartering with success. This is because the yacht brokerage industry in Florida is, simply put, a free for all.

### B. Mr. Perez's Role with Advantaged

23.     Mr. Perez's affiliation with Defendants began in June of 2014. That month, Mr. Perez obtained a Yacht Broker License, assigned it to Advantaged, and engaged with Advantaged to broker yacht sale-and-purchase transactions on a commission-only basis.

24.     On August 11, 2015, Mr. Perez and Advantaged entered into a Non-Disclosure and Non-Compete Agreement (the "Employment Agreement"). *See* Employment Agreement attached hereto as Exhibit "A."[2]

---

[2] On October 6, 2020, Mr. Perez received a cease and desist letter from Advantaged that claimed

25. Until the termination of his employment, Mr. Perez was employed by Defendants within the meaning of 29 U.S.C. § 203(g).

26. All aspects of Mr. Perez's daily responsibilities were tightly managed by Defendants and the policies, procedures, and practices they enacted. For example, Mr. Perez was:

   a. required to work on a fixed schedule set by Advantaged that he could not deviate from without prior approval;

   b. required to use company-provided forms, contracts, software, and other tools;

   c. required to follow company-prescribed procedures and instructions;

   d. provided with a logo-bearing uniform he was required to wear; and

   e. provided a desktop computer, and a desk in the company office.

27. Under the Employment Agreement, Mr. Perez was entitled to (a) guaranteed, regular wages of $600 per week and (b) any commissions earned by Mr. Perez for yacht charters and sales he generated. *See* Ex. A at § 1. Mr. Perez made no significant financial investment in Advantaged and had no opportunity for profit or loss in connection with his position.

28. Although Mr. Perez's responsibilities included sales, he devoted a large portion of his hours worked to administrative and customer-service tasks that required his physical presence in the office and were unrelated to his own outside sales or solicitations.

**C. Mr. Perez Worked Overtime Without Compensation**

29. Throughout Mr. Perez's Advantaged employment, he routinely worked more than 40 hours in a workweek.

---

he was violating a Non-Disclosure and Non-Compete Agreement executed by Mr. Perez and Advantaged on August 11, 2015. Mr. Perez requested a copy of the at-issue agreement. Advantaged then provided Mr. Perez with the agreement attached as Exhibit "A."

30. Defendants failed to pay Mr. Perez overtime wages for hours worked in excess of 40 hours in a workweek.

31. Mr. Perez typically worked at least five days a week, often six. However, it was a common and reoccurring practice for Mr. Perez to work additional hours from home on tasks that furthered Defendants' business.

32. Defendants additionally required Mr. Perez to solicit new clients for Defendants while off duty by networking at yacht-related events. Mr. Perez received no compensation for this time spent in furtherance of Defendants' interest.

### D. Defendants Fraudulently Misrepresented Mr. Perez's Employment Classification

33. At all times, up to and through the termination of his employment with Advantaged, Defendants Yanez and Maldonado, both individually and on behalf of Advantaged, falsely held Mr. Perez out to be an independent contractor.

34. Mr. Perez was not an independent contractor. Mr. Perez was an employee.

35. Defendants were aware that their representations to Mr. Perez that he was an independent contractor were false. The misrepresentations were designed to circumvent Mr. Perez's legal rights as an employee of Advantaged and to avoid additional taxes. Mr. Perez relied on Defendants' statements regarding his employment status. Defendants deprived him of overtime compensation, employment tax contributions, and other employment-related rights to which he was entitled.

36. Both Yanez and Maldonado as well as Advantaged had the ability to correct this misrepresentation, yet chose instead to continue to lie to Mr. Perez for their own benefit.

### E. Defendants Breached the Employment Agreement's Compensation Provisions

37. At the same time that Mr. Perez was not paid overtime, he was also denied proper compensation under the Employment Agreement.

38. Among other compensation, the Employment Agreement entitled Mr. Perez to a 10-percent (10%) commission for "all new clients [he] brings to [Advantaged] out of the [p]rofit per [c]harter[…]" *See* Ex. A at § 1.

39. On many paydays, Advantaged refused to pay Mr. Perez the agreed-upon compensation. For example:

   a. In 2019, Mr. Perez secured at least two new charters through the concierge at The Fendi Chateau, a Miami Beach hotel. Advantaged only paid him a 5-percent commission on those charters. When questioned, Yanez said Advantaged had unilaterally reduced Mr. Perez's commission, despite Mr. Perez originating the client.

   b. In late 2018, Mr. Perez brokered the sale of a vessel known as the *Uniesse*, a 54-foot yacht. This was a new client for Advantaged. Unbeknownst to Mr. Perez, the vessel's owner had an unpaid balance with a ship-maintenance company owned by Maldonado. On payday, Advantaged, at the direction of Maldonado, deducted the vessel owner's maintenance balance from Mr. Perez's commission.

40. Incidents like these—of Advantaged miscalculating, withholding, or taking unilateral deductions from Mr. Perez's compensation—were a frequent occurrence during Mr. Perez's tenure with Advantaged.

### F. Advantaged Lays Mr. Perez Off Due To COVID-19

41. In or about April 2020, Advantaged laid Mr. Perez off from his salaried position in connection with the COVID-19 pandemic.

42. Two months later, Mr. Maldonado attempted to rehire Mr. Perez at half of his salary for the same job.

43. Mr. Perez responded that he would only rejoin Advantaged if Defendants (a) settled the commission payments on which they had defaulted and (b) honored a $100 annual increase in his weekly salary that Maldonado had verbally promised him in April 2017.

44. Maldonado and Yanez refused. Mr. Perez moved on.

### G. Defendants Stifle Mr. Perez's Competition After His Separation from Advantaged

45. Although his meeting with Maldonado and Yanez went south, Mr. Perez still had a family to support. The yacht brokerage industry was, in Mr. Perez's experience, an open market. Because exclusive relationships were rare among yacht owners, brokers, and customers, anyone willing to work hard could enter that market successfully. So, Mr. Perez turned to brokering yacht sales and charters to make a living.

46. Defendants responded by threatening Mr. Perez and other market actors in an attempt to stop Mr. Perez's lawful competition.

47. In one instance, a vessel owner named Rick Maribini approached Mr. Perez in August of 2020 to charter his yacht at a wholesale price of $5,500. Mr. Perez brokered one charter for Mr. Maribini's yacht to go out on Labor Day weekend for approximately $8,000. At that price, Mr. Perez stood to make nearly $2,500 on this charter after paying Mr. Maribini's wholesale fee.

48. When Defendants learned of Mr. Perez's charter for Mr. Maribini, Yanez and Maldonado, individually and on behalf of Advantaged, immediately interfered with that business relationship by:

   a. advising Mr. Maribini that Mr. Perez is subject to enforceable restrictive covenants—which he is not—and that brokering charters through Mr. Perez would implicate him in litigation;

   b. threatening to sue Mr. Maribini directly to recover any commissions he paid to Mr. Perez for any charters Mr. Perez has brokered; and

9

   c. threatening to send agents to physically prevent Mr. Maribini's yachts from setting sail on charters brokered by Mr. Perez.

49. Intimidated by Defendants' threats, Mr. Maribini cancelled the charter on the same day it was scheduled to depart. As a result, Mr. Perez lost the $2,500 profit margin he was going to make on this charter. More significantly, Mr. Maribini has since demanded compensation from Mr. Perez to compensate him for losing the wholesale fee on the charter.

50. To date, Mr. Maribini and Mr. Perez have had no additional business dealings.

51. Advantaged followed this episode by sending Mr. Perez a cease-and-desist letter threatening a lawsuit based on the invalid and unenforceable restrictive covenants contained in the Employment Agreement.

52. Because of Defendants' conduct, Mr. Perez's reputation as a reliable broker has been undermined among yacht owners and brokers, and he has been unable to cultivate any new clients due to concerns about litigation and intimidation by Defendants.

### H. Advantaged's Restrictive Covenants are Unenforceable and Illegal

53. The restrictive covenants ("Restrictive Covenants") Advantaged seeks to enforce against Mr. Perez are contained in Sections 5 and 10 of the Employment Agreement:

> 5. . . . Contractor agrees and covenants that because of the confidential and sensitive nature of the Confidential Information and because the use of, or even the appearance of the use of, the Confidential Information in certain circumstances may cause irreparable damage to Company and its reputation, or to clients of Company, Contractor may be employment by other company but not directly competitive company thereafter, however, contractor may not contact or hire Companies' clients for contractor's benefits or any other competitive companies [sic] business gains.

> 10. . . . If Contractor's employment with Company terminates for any reason, the Contractor shall not, for a period of two years from the date of termination, have any business dealings whatsoever . . . with any customer or client of Company or its subsidiaries or any person or firm which has contacted or been contacted by Company as a potential customer or client of Company, and Contractor shall keep in strictest confidence . . . any information which in good faith and good conscience ought to be treated as confidential information including, without limitation,

information relating to the software developed by Company, information as to sources of, and arrangements for, hardware supplied to customers or clients of Company, submission and proposal procedures of Company, customer or contact lists or any other Confidential Information.

Ex. A at § 5, 10.

54. These Restrictive Covenants do not act to protect any of Advantaged's legitimate business interests. They serve only to restrain trade by cutting a talented and experienced broker from the Florida yacht market. They are unenforceable as a matter of law.

### 1. *Advantaged Lacks Protectable Confidential Information*

55. There is no confidential information at issue that constitutes a legitimate business interest.

56. The specifications, features, and operations of yachts are publicly available and can be learned through publicly available means such as the internet.

57. The identity and wholesale pricing of yacht owners are neither confidential nor competition sensitive. Yachts are docked in plain view, and if a broker wants to know a yacht's owner, the broker can identify them from public records or from marina staff. Consequently, yacht owners typically share their wholesale pricing with a number of brokers to receive more charters.

58. When pressed with these facts in Plaintiff's responses to cease-and-desist letters, Advantaged's counsel, Alexander Lian, took the outlandish position that the charter agreement Mr. Perez allegedly utilized with Mr. Maribini's transaction is confidential and proprietary. However, the allegedly "proprietary" charter agreement is an industry standard bareboat-demise contract that can be found online. Indeed, the first result in a google search for "Bareboat Demise Charter Contracts" yielded a blank version of the exact contract (less minor formatting variations) that Mr. Lian claims to be so protected and valuable.

59. Mr. Perez was never privy to any confidential information, let alone, confidential information that rises to the level of a legitimate business interest.

### 2. Advantaged Lacks Protectable Relationships

60. There are no substantial, protectable customer or other relationships at issue.

61. Protectable customer relationships only exist where the relationship is exclusive or near exclusive, long-term, customers cannot be easily identified and solicited by other merchants, and there is a reasonable expectation of continued future business.

62. Advantaged rarely—if ever—has an exclusive or near exclusive relationship with a yacht owner, either in connection with yacht sales or charters.

63. This is because it makes little business sense for yacht owners to arbitrarily hamstring themselves to one charter company when they could be profiting from several.

64. Instead, yacht owners, who are easily identified and solicited, routinely work with several charter companies to maximize the utility of their yachts.

65. The same is true of those chartering yachts. The vast majority of the time, such deals are one-offs for single day rentals. Upon returning to a marina, the business transaction between Defendants and the individual(s) chartering the yachts ends. Defendants have no justifiable belief that they will do business with individual(s) chartering yachts again, nor are such individuals subject to any type of exclusive deal with Advantaged.

### 3. Advantaged Did Not Supply Mr. Perez with Extraordinary Training

66. The only training Advantaged ever provided Mr. Perez was a quick tutorial on how to upload a yacht's information to "Yacht World", a public database similar to the real estate industry's MLS database.

67. Advantaged never provided Mr. Perez with any training beyond that which is standard in the yacht brokerage industry.

## COUNT I – BREACH OF CONTRACT
(as to Defendant Advantaged)

68. Mr. Perez repeats and realleges the allegations in paragraphs 1, 4, 6, 7, 10, 14, 16, 17, 19, 20, 24, 26-28, and 37-40 as if fully set forth herein.

69. Mr. Perez entered an Employment Agreement with Advantaged on August 11, 2015.

70. Pursuant the Employment Agreement, Mr. Perez was entitled to six hundred dollars a week, paid on a bi-weekly basis, and a ten percent commission, taken out of the profit per each charter, for all new clients he brought to Advantaged. *See* Ex. A at § 1.

71. Advantaged has failed to properly compensate Mr. Perez pursuant the terms of the Employment Agreement.

72. Advantaged's actions constitute a material breach of the Employment Agreement by Advantaged.

73. As a direct and proximate result of Advantaged's breach of the Employment Agreement, Mr. Perez has suffered harm and is entitled to actual and consequential damages resulting from Advantaged's conduct in an amount to be determined at trial.

## COUNT II – DECLARATORY JUDGMENT THAT THE RESTRICTIVE COVENANTS ARE UNENFORCEABLE UNDER FLA. STAT. § 542.335
(as to Defendant Advantaged)

74. Mr. Perez repeats and realleges the allegations in paragraphs 1, 4-7, 10, 16, 17, 19-30, 32-35, and 37-67 as if fully set forth herein.

75. Advantaged, through Yanez, Maldonado, and otherwise, maintains that Mr. Perez is subject to enforceable non-compete and non-solicitation restrictions.

76. A dispute exists between Advantaged and Mr. Perez regarding the enforceability of the at-issue restrictive covenants.

77. There exists an actual controversy that flows from Advantaged's assertions that Mr. Perez is bound by the restrictive covenants such that his fair competition in the business of brokering yacht charters and yacht sales is prohibited.

78. Plaintiff and Advantaged's legal rights, powers, and duties depend upon a declaration by this Court.

79. All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

80. Neither the controversy nor the facts upon which it is based are hypothetical. The Parties have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the enforceability of the restrictive covenants would immediately clarify the Parties' respective rights, powers, and duties.

81. Plaintiff has suffered and is threatened with further injuries because of Advantaged's representations, through Yanez, Maldonado, and otherwise, that he is bound by the restrictive covenants and that the restrictive covenants prohibit his lawful brokerage of yacht charters and yacht sales.

82. The restrictive covenants at issue constitute unlawful restraints of trade under Florida Statute § 542.335 because they are neither supported by nor necessary to protect any legitimate business interests. Specifically:

    a. Mr. Perez did not receive any specialized or extraordinary training from Defendant Advantaged;

    b. Mr. Perez did not have access to and was not exposed to any confidential business information that was unique to Advantaged and could be used to engage in unfair competition;

  c. No customer relationships potentially at issue are substantial or protectable within the meaning of Florida Statute § 542.335; and

  d. There are no other legitimate business interests that could justify enforcement of the at-issue restrictive covenants.

83. The restrictive covenants merely serve to prevent competition *per se*, rendering them violative of Florida Statute § 542.335 and unenforceable as a matter of law.

84. Accordingly, Mr. Perez seeks a declaration that the restrictive covenants at issue are invalid and unenforceable under Florida law.

## COUNT III – TORTIOUS INTERFERENCE
(as to all Defendants)

85. Mr. Perez repeats and realleges the allegations in paragraphs 1-10, 16-24, and 41-67 as if fully set forth herein.

86. Defendants have tortiously interfered with a number of Mr. Perez's advantageous business relationships. Specifically, after Mr. Perez resigned from Advantaged:

  a. Mr. Perez was engaged by yacht owners to broker charters for their vessels. Mr. Perez brokered such charters. Yacht owners agreed to pay Mr. Perez commissions on those charters.

  b. Defendants knew of the existence of these business relationships between Mr. Perez and yacht owners.

  c. Defendants intentionally and unjustifiably interfered with these business relationships by jointly spreading falsehoods about Mr. Perez to yacht owners, threatening yacht owners with litigation, sending cease and desist letters, and warning yacht owners that its agents will physically prevent their vessels from setting sail if they work with Plaintiff.

  d. As a result of Defendants' interference, numerous prospective clients will not utilize Mr. Perez's services even though there is no contractual or other restriction on their ability to do so.

87. At a minimum, Defendants tortiously interfered with the business relationship between Mr. Perez and Rick Maribini.

15

88. As a direct and proximate result of Defendants' tortious interference with Mr. Perez's business relationships, Mr. Perez has suffered, and will continue to suffer, damages for which he is entitled actual and consequential damages.

### **COUNT IV – VIOLATION OF THE FAIR LABOR STANDARDS ACT**
(as to all Defendants)

89. Mr. Perez repeats and realleges the allegations in paragraphs 1-15, 17-19, and 23-40 as if fully set forth herein.

90. During Mr. Perez's employment with Advantaged, Mr. Perez regularly worked in excess of forty (40) hours a week.

91. Mr. Perez's job duties included both sales and administrative related tasks that required his physical presence in the office for the majority of his hours worked.

92. 29 U.S.C. § 207 of the FLSA requires covered employers, such as Defendants, to compensate all non-exempt employees, such as Mr. Perez, at a rate not less than one and one-half times their regular rate of pay for work performed in excess of forty (40) hours per workweek.

93. Defendants failed to pay Mr. Perez overtime wages for hours worked over forty (40) hours a workweek. As such, Mr. Perez is entitled to overtime compensation at one and one-half times his regular rate of pay for all work performed in excess of forty (40) hours per workweek.

94. Defendants failed to make, keep, and preserve accurate records with respect to Mr. Perez's hours worked each workday and total hours worked each workweek, as required by 29 U.S.C. § 211(c) and supporting federal regulations.

95. Defendants' unlawful conduct was willful and intentional. Defendants were aware or should have been aware that their practices with regard to the compensation of Mr. Perez violated the FLSA.

96.     Due to the intentional, willful, and unlawful acts of Defendants, Mr. Perez was deprived of overtime compensation in amounts to be determined at trial, and Mr. Perez is entitled to recovery of such amounts plus an equal amount as liquidated damages and attorneys' fees pursuant to the FLSA.

### COUNT V – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
(as to Defendant Advantaged)

97.     Mr. Perez repeats and realleges the allegations in paragraphs 1-3, 7, 10-14, 16, 17, 19, 20, 23-36, and 40 as if fully set forth herein.

98.     During his tenure with Advantaged, Mr. Perez was misclassified as an independent contractor instead of an employee in violation of the FLSA.

99.     Advantaged's misclassification of Mr. Perez was an unethical, unscrupulous, and substantially injurious practice that:

   a. violated established public policy under Federal and Florida law; and

   b. gave Advantaged an unfair advantage over its competitors by, among other things, enabling Advantaged to unlawfully avoid paying overtime compensation and employment taxes.

100.    Advantaged actively participated in perpetuating this deceptive and unfair practice and had the measure of control required to change it. It did not.

101.    As a result, Advantaged is liable.

102.    This unfair and deceptive practice was not reasonably avoidable by Mr. Perez.

103.    As a direct and proximate result of Advantaged's misclassification, Mr. Perez suffered actual damages in an amount to be proven at trial.

## **COUNT VI – FRAUD**
(as to all Defendants)

104. Mr. Perez repeats and realleges the allegations in paragraphs 1-10, 13, 14, and 16-40 as if fully set forth herein.

105. Defendants Yanez and Maldonado, individually and on behalf of Advantaged, materially misrepresented to Mr. Perez that he was properly classified as an independent contractor rather than an employee. Defendants' material misrepresentation of Mr. Perez's employment classification transpired for the entire duration of Mr. Perez's tenure with Advantaged, as Mr. Perez was always held out to be an independent contractor up to and including the date of his termination.

106. At the time of making these representations, Defendants knew that they were false.

107. Defendants Yanez and Maldonado, individually and on behalf of Advantaged, intended their false representations to induce Mr. Perez to join Advantaged in a full-time capacity while allowing them to avoid payment of overtime compensation and employment taxes.

108. Mr. Perez justifiably relied on Defendants' material misrepresentations about the status of his employment classification. This was evidenced by, among other things, Mr. Perez's continued engagement with Advantaged.

109. As a direct result of Defendants' fraud, Mr. Perez has suffered, and continues to suffer, significant damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court award him:

a. A declaratory judgment holding that all non-compete and non-solicitation restrictions contained in the Employment Agreement between Mr. Perez and Advantaged are unenforceable;

b. Compensatory damages suffered as a result of Defendants' tortious interference;

c. Punitive damages as a result of Defendants' tortious interference;

d. Compensatory damages suffered as a result of Advantaged's breach of contract;

e. Compensatory damages suffered as a result of Defendants' violation of the FLSA;

f. Liquidated damages as a result of Defendants' violation of the FLSA;

g. Compensatory damages suffered as a result of Defendant's fraud;

h. Punitive damages as a result of Defendant's fraud;

i. Actual damages suffered as a result of Defendants' violation of the FDUTPA;

j. Pre- and post-judgment interest;

k. Attorneys' fees and costs of these proceedings; and

l. Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

|  |  |
|---|---|
| Dated: November 17, 2020 | Respectfully submitted,<br><br>By: /s/ *Christopher S. Prater*<br>Jonathan Pollard<br>Florida Bar No.: 83613<br>jpollard@pollardllc.com<br><br>Christopher S. Prater<br>Florida Bar No.: 105488<br>cprater@pollardllc.com<br><br>**Pollard PLLC**<br>100 SE 3rd Ave., Suite #601<br>Fort Lauderdale, Florida 33394<br>Telephone: (954) 332-2380<br>Fax: (866) 594-5731<br>*Attorneys for Plaintiff* |